UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

| | | |
|---|---|---|
| **LORI COLCA,** | : | |
| | : | **CIVIL ACTION NO.:** 3:18-cv-30156 |
| **Plaintiff** | : | |
| v. | : | |
| | : | |
| **CELLCO PARTNERSHIP d/b/a** | : | |
| **VERIZON WIRELESS** | : | **SEPTEMBER 21, 2018** |
| **Defendant.** | : | |

_____

## COMPLAINT

**I.   PRELIMINARY STATEMENT**

Plaintiff, Lori Colca, brings this Complaint against her former employer, Cellco Partnership, d/b/a Verizon Wireless ("Defendant" or "Verizon").  Plaintiff asserts that she was discriminated against, harassed, retaliated against and discharged by Defendant. Plaintiff brings claims for age and gender discrimination and retaliation in violation of the Age Discrimination in Employment Act, ("ADEA"), Title VII of the Civil Rights Act of 1964, 42 U.S.C 2000e et. seq. ("Title VII"); and Section 151b of the Massachusetts General Laws ("MGL C.151b").

**II.   JURISDICTION AND VENUE**

1.   <u>Subject matter jurisdiction</u>.  This Court has jurisdiction pursuant to 28 U.S.C. §§1331 and 1332 and 29 U.S.C. §216(b). This Court has original jurisdiction over this matter based on the questions of federal law presented and the federal statutes cited. Diversity of citizenship also exists as Plaintiff is a resident of the State of Connecticut and Defendant is a General Partnership with a principal place of business in New Jersey.

Personal jurisdiction.  This court has personal jurisdiction pursuant to 28 U.S.C. §1391(c) as Plaintiff was employed by Defendant in the state of Massachusetts and Defendant Verizon does business and employees numerous employees in the State of Massachusetts.

3. Venue.  Venue is proper in the District of Massachusetts under 28 U.S.C. Sec. 1391, as all events giving rise to this action occurred within this district and the Defendants all do business in this district.

## III. PARTIES

4. The Plaintiff, Lori Colca, is a 58 year-old female individual who resides, and at all relevant times resided, in Enfield, Connecticut.

5. The Defendant, Cellco Partnership, d/b/a Verizon Wireless ("Defendant" or "Verizon") is a New Jersey General Partnership with its headquarters and principal place of business located at One Verizon Way, Basking Ridge, New Jersey.

## IV. STATEMENT OF FACTS

6. Plaintiff, Lori Colca, was employed by Verizon or its predecessors for approximately 27 years.

7. Plaintiff had a long and proven record of success with Verizon, earning promotions, bonuses, commissions, and positive performance reviews.

8. Plaintiff was employed as the General Manager of the Verizon store in Enfield, Connecticut for approximately thirteen years, from 2000 to October of 2013.

9. During her tenure as General Manager, the Enfield store was one of the top performing stores in its region, as measured by Verizon's own metrics.

10. Plaintiff received "on target" performance reviews and was unaware of significant issues with her performance.

11. In 2012, when Plaintiff was 52 years of age, she was transferred to a store in Avon, Connecticut. The move meant a longer commute for her every day. Her District Manager at the time said, "Watch Lori fall on the floor when I tell her she is being moved." He was laughing when he said it.

12. There was no logical business reason to transfer Plaintiff at that time. She believed that her age and/or gender played a role in that decision.

13. Plaintiff simply buckled down and went to work. After four months in Avon, where she continued to be an effective and successful manager, she was transferred back to the Enfield store.

14. At the time, Verizon was in the process of preparing a newer and more modern location for its store in Enfield.

15. Plaintiff was looking forward to the opening of the new location and the opportunities it presented for her and her staff, as well as Verizon. Plaintiff really wanted to be there when the new store opened to make sure everything went smoothly.

16. Instead, however, she was told that she was being transferred once again, this time to the Verizon store in Holyoke, Massachusetts.

17. The Holyoke store was about as different as can be from the new store opening in Enfield. The Holyoke store was older and smaller. Holyoke had been struggling for some time and there was speculation that the store was going to be closed.

18. Again, Plaintiff did not understand why she was being transferred; her sales numbers and other metrics continued to be good and she continued to work hard to mentor her staff to prepare them for future advancement and success.

19. Plaintiff was told by Human Resources that because the Holyoke store was a smaller Level III store she would be required to take a $12,000 cut in salary. Again, this didn't seem fair to her as it was not her request to be transferred. She was able to negotiate a limited pay cut of $6,000 per year in salary.

20. When Plaintiff asked about the reason for the transfer, she was told that she didn't "fit the prototype" of a General Manager. She was also asked about her plans for retirement.

21. Almost all the General Managers in the region and throughout Verizon were younger than Plaintiff and male. A younger male was named General Manager in Enfield prior to the opening of the new store in December of 2013.

22. Plaintiff believed, and continues to believe, that her age and gender were motivating factors in the decision to transfer her.

23. Again, Plaintiff simply buckled down and went to work. She continued to be an effective manager, working hard to develop my staff and encourage their growth. There were issues that came up with the staff that Plaintiff inherited, but she dealt with them and moved on.

24. On November 24, 2014, Plaintiff was told that there were some concerns about scheduling. She came up with a plan to address those concerns immediately; as nothing more was said she assumed that the issues were resolved.

25. At the end of the year Plaintiff received a positive "On-target" evaluation of her performance for 2014.

26. This evaluation was supported by positive sales numbers and other metrics.

27. Despite her positive performance evaluation and numbers, Plaintiff was contacted by Human Resources and told that her supervisor felt she would be better suited for an individual contributor role. This would be another demotion and a significant cut in compensation. No explanation was given for this request; which Plaintiff politely declined.

28. On February 23, 2015, Plaintiff was told by her supervisor, District Manager Joshua Rhodes, that she was being put on a Performance Improvement Plan ('PIP").

29. This was shocking to her as she had always been an exemplary manager and was not aware of any deficiencies that would warrant a performance improvement plan. Plaintiff had just received a positive review, and her sales results and other metrics were also positive; confirming the positive strides the Holyoke store made since Plaintiff's arrival.

30. Plaintiff was told that, "based on historical data and current observations she was not fulfilling the basic expectations of the required leadership behaviors."

31. Although Plaintiff did not believe there was any valid basis for putting her on a PIP, and was not given any specific credible information to support it, she worked hard to make sure she met or exceeded each of the areas of concern outlined in the PIP.

32. Plaintiff had previously applied for and was granted a leave of absence for foot surgery. The surgery was scheduled for and took place on March 4, 2015. Although

she was approved for medical leave from March 4, 2015 to April 19, 2015, Plaintiff actually returned to work ahead of schedule, on April 7, 2015.

33.     On April 20, 2015, Plaintiff had her first and only face to face to face meeting with Josh Rhodes during the entire PIP process.  They had a brief meeting before he excused himself to take a conference call.

34.     Rhodes asked Plaintiff if she wanted to start the whole PIP process over since she had been out on leave. She declined.  The feedback Plaintiff received during this meeting was all positive. Rhodes stated that her absence had done her good; that there was a "positive vibe" in the store; and that "your people are happy to have you back." Based on Rhodes' comments, and the fact that no performance issues were discussed, Plaintiff assumed that everything was good.

35.     The following day, April 21, 2015, Josh Rhodes was scheduled to meet with all the GMs who reported to him.  He told them he could not make it and to "meet with yourselves."  The seven GMs met and essentially voiced their frustration with Josh Rhodes' lack of presence in the stores, commitment and leadership.

36.     Of the seven GMS who met, Plaintiff was the oldest and one of only two females. The average age of the other GMs was approximately 30.

37.     Rhodes later called the GMs to apologize.  He explained that he was very stressed as he had sold his house and was in the process of buying a new one.  In the meantime, Rhodes and his wife and four young children (including triplets) were living with his in-laws.

38.     Plaintiff's numbers for April were all positive, reflecting her commitment to sales and customer service. Plaintiff had not heard anything more about the PIP, and all the

feedback she had heard from Josh Rhodes was positive, so she assumed she had met the requirements and the PIP was over.  Plaintiff's store had another solid performance in May.

39.    On May 28, 2015, Plaintiff was shocked to find that her supervisor had placed her on the second thirty-day stage of her performance improvement plan. Again, the claims and allegations contained in the document were false, unsupported, and contradicted by Defendant's own published metrics. Plaintiff had not heard a single word about her performance since the meeting on April 20, 2015 when Josh Rhodes said that the staff was happy to have her back after her medical leave and that "the vibe in the store was good."  Plaintiff did not have not have a single meeting with Josh Rhodes in May for advice, mentoring, or counseling for improvement.  Nor did he communicate with Plaintiff in any other way concerning the PIP.

40.    Plaintiff prepared written documentation challenging these findings and demonstrating how she had addressed each and every area of concern. Plaintiff's attempts to engage in any kind of a discussion fell on deaf ears. She felt that the whole PIP process was a pretextual sham; and that despite the objective facts and documentation of her efforts and successes she was being set up for termination.

41.    Josh Rhodes was s out on leave from June 7 to June 25, 2015.  There were no meetings and virtually no contact with him during this time period.

42.    On June 30, 2015, which was Plaintiff's day off, she was advised that a Human Resources representative had visited the store to interview a select few employees.

43.    Plaintiff did not receive any direct feedback as a result of that visit.  The next day, however, a colleague called Plaintiff to tell her that Stephanie Bassett from HR had

stopped into her store. This colleague informed Plaintiff that Bassett had shared with her specifics of what one of her employees had allegedly said during his interview. Plaintiff was appalled that supposedly confidential information was being shared with her colleague, especially when that same information was not being shared with her.

44. Plaintiff was advised by a colleague to watch her back as Josh Rhodes was approaching her subordinates looking for negative information to use against her. Rhodes deliberately came to meet with Plaintiff's employees on her days off; and took them to meetings at locations outside of the store. When he came to meet with Plaintiff they met in the storage closet upstairs. This was done intentionally to humiliate Plaintiff in front of her employees.

45. On July 13, 2015, Plaintiff was issued the third and final 30-day period of her performance improvement plan. She was once again told that she wasn't fulfilling the expectations of the required leadership behaviors. The allegations against her appeared to be in direct conflict with the feedback that she'd received from her employees. Again, she had not received notice of any deficiencies in the intervening 30 days, nor had she had meetings with Josh Rhodes or anyone else concerning the PIP.

46. Plaintiff was also perplexed as the Holyoke store was coming off the best month it had ever had. For June of 2015, the store was ranked 3rd out of 89 stores in the region. Holyoke also received gold star status for the second quarter for customer experience.

47. Plaintiff felt that the PIP was a complete set up; that she was heading down the road towards her inevitable termination; and that there was nothing she could do to stop it, regardless of her efforts, achievements and results.

48. Plaintiff was feeling increasingly anxious, depressed and undermined by Joshua Rhodes and Verizon management. The increasingly hostile work environment led her to feel more and more anxious and stressed out. Plaintiff was fearful of being terminated in front of her employees; and that she would break down in front of them.

49. Plaintiff became anxious and depressed. She felt that she was in a hopeless situation, that no matter what she did and despite the objective evidence on her successful management, Verizon was determined to terminate her employment.

50. Plaintiff simply could not return to work in what had become a hostile work environment. As a result, her last day of work was July 13, 2015.

51. Plaintiff applied for and was granted medical leave beginning July 14, 2015.

52. Plaintiff was extremely anxious and depressed. She could not sleep at night and at times could not stop crying. She could not eat and lost weight. She lost interest in her normal activities and avoided socializing. She could not understand why she was targeted for termination after all her years of dedicated service. She was completely overwhelmed.

53. Plaintiff was a hard-working, diligent, and loyal employee for 27 years; starting her career with Verizon when she was just 28 years old. She planned to remain with Verizon until she retired.

54. Plaintiff made countless sacrifices for Verizon; working weekends and holidays instead of spending them with her family; and going in on my days off when other employees called out or she was needed for some other reason.

55. She persevered despite being transferred, having her compensation cut, and otherwise being singled out and targeted.

56. The objective numbers show that Plaintiff had positive sales and other metrics throughout the period she managed the Enfield store; sales improved while Plaintiff was managing the Avon store; and in Holyoke the sales numbers improved dramatically, from being a store on the bring of elimination to one of the top performers in the region. All of this was as a result of Plaintiff's hard work, skills and ability to manage staff.

57. Plaintiff's efforts and results are objectively documented. Verizon's own numbers, reports and metrics demonstrate that Plaintiff's store was one of the top performers in the region by any objective analysis.

58. On September 9, 2015, Plaintiff dual-filed a charge of discrimination with the Massachusetts Commission Against Discrimination ("MCAD") the Equal Employment Opportunity Commission ("EEOC").

59. In a submission to the Commissions, Plaintiff's counsel made an argument that Plaintiff's separation from work on July 13, 2015 could be considered a constructive discharge.

60. As a direct response to this, and in retaliation for Plaintiff asserting her right to make this claim, Defendant terminated Plaintiff's employment on August 4, 2016, retroactive back to July 14, 2015.

61. Prior to that time, Plaintiff was still an employee, although out on a leave of absence. During that time frame, Plaintiff was not paid her accrued vacation, sick time, holiday pay, and other paid time off in a timely fashion. While Verizon has claimed this was an oversight, it was in fact additional discriminatory and retaliatory conduct.

62. As a result of her termination on August 4, 2016, Plaintiff no longer received any payments or benefits from Verizon.

63.     Plaintiff was terminated as a direct response to her asserting claims of discrimination and making legal arguments in support of those claims.  This constitutes unlawful retaliation.

**V.     COUNT ONE: TITLE VII**

64.     Plaintiff's gender (Female); retaliation for her filing claims of discrimination, opposition to discriminatory conduct; or retaliation for making legal arguments in support of her claims was a motivating factor in the adverse employment actions she experienced, including her constructive discharge on July 13, 2015 and her actual termination on August 6, 2016.

65.     Defendant's actions as described above are in violation Title VII of the Civil Rights Act of 1964, 42 U.S.C 2000e et. seq.

66.      Plaintiff is entitled to damages as a result, including back pay, front pay, loss of benefits, compensatory damages, prejudgment and post-judgment interest and attorney's fees and costs.

67.     Plaintiff has exhausted hers administrative remedies by filing an administrative charge with MCAD and the EEOC and receiving a release of jurisdiction and right to sue letter from the EEOC.

**VI.    COUNT TWO: ADEA**

68.     Plaintiff's age; retaliation for her filing claims of age discrimination; opposition to discriminatory conduct; or retaliation for making legal arguments in support of her claims was a motivating factor in the adverse employment actions she experienced, including her constructive discharge on July 13, 2015 and her actual termination on August 6, 2016.

69.     Defendant's actions as described above are in violation of the Age Discrimination in Employment Act, 29 U.S.C. 621 et. seq.

70.      Plaintiff is entitled to damages as a result, including back pay, front pay, loss of benefits, compensatory damages, liquidated damages equal to back pay, prejudgment and post-judgment interest and attorney's fees and costs.

71.     Plaintiff has exhausted her administrative remedies by filing an administrative charge with MCAD and the EEOC and receiving a release of jurisdiction and right to sue letter from the EEOC.

### VII.     COUNT THREE: Violation of MGL C.151b

72.     Plaintiff's age, gender (Female); retaliation for her filing claims of discrimination, opposition to discriminatory conduct; or retaliation for making legal arguments in support of her claims was a motivating factor in the adverse employment actions she experienced, including her constructive discharge on July 13, 2015 and her actual termination on August 6, 2016.

73.     Defendant's actions as described above are in violation of  MGL C.151b.

74.      Plaintiff is entitled to damages as a result, including back pay, front pay, loss of benefits, compensatory damages, prejudgment and post-judgment interest and attorney's fees and costs.

75.     Plaintiff has exhausted his administrative remedies by filing an administrative charge with MCAD and the EEOC and receiving a release of jurisdiction and right to sue letter from the EEOC.

**VIII.   DEMAND FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in hers favor and award all damages available at law or in equity, including but not limited to:

a. Lost wages including back pay, front pay, injury to Plaintiff's earning capacity and the value of benefits not provided;

b. Reimbursement of out of pocket medical and other expenses;

c. Compensatory damages including emotional distress, mental anguish, injury to reputation and loss of enjoyment of life's activities;

d. Exemplary, liquidated and/or punitive damages;

e. Attorney's fees, costs and expenses;

f. Pre- and post-judgment interest at the highest rate allowed by law; and/or

g. Such other relief as justice and equity allows.

**IX.   JURY DEMAND**

Plaintiff demands a jury trial as to all claims triable to a jury.

THE PLAINTIFF,
LORI COLCA

By: /s/ *Robert Fortgang*
Robert Fortgang, BBO# 678311
Robert Fortgang Associates, LLC
573 Hopmeadow Street
Simsbury, CT 06070
P: 860-658-1055
F: 860-658-0565
rob@fortgangemploymentlaw.com